U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2012 FEB -8 PM 2: 54

CLERK
BY___PM___
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA    )
                            )
    v.                      )      Case No. 5:11-cr-90-03
                            )
JONATHAN DELVALLE           )

**OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**
(Doc. 34)

This matter came before the court on November 29, 2011, for oral argument on the motion to suppress evidence filed by Defendant Jonathan Delvalle. (Doc. 34.) Defendant is charged with knowingly and willfully conspiring to distribute oxycodone, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 846. Defendant contends that law enforcement arrested him without probable cause based on an impermissibly suggestive identification procedure, and moves for suppression of his statements and other evidence obtained subsequent to his arrest. The Government opposes the motion and counters that the identification procedure was not impermissibly suggestive and that, in any event, probable cause existed for Defendant's arrest even without the identification.

Defendant is represented by Lisa B. Shelkrot, Esq. The Government is represented by AUSA Timothy C. Doherty, Jr.

**I.    Factual and Procedural Background.**

Neither party presented evidence at the court's hearing on the motion. Instead, the parties relied upon the Affidavit of Vermont State Trooper Detective Matthew Daley (the "Daley Affidavit") filed in support of the criminal complaint filed in this action. Post-hearing, by letter dated December 1, 2011, AUSA Doherty advised the court and opposing counsel that there was a "cruiser camera" video of law enforcement's initial encounter with Defendant which, when obtained, would be made available to opposing

counsel and the court. On December 19, 2011, in a suppression hearing held in *United States v. Elkin Tabares*, the court viewed the videotape in question[1] and heard other evidence relevant to the pending motion.

According to the Daley Affidavit, in approximately June of 2011, the Vermont Drug Task Force ("VDTF") began investigating co-defendant Michael Larrow for the distribution of oxycodone. Mr. Larrow lives at 73 Hyde Road in Grand Isle, Vermont. He operates a bait shop from that same address. As part of VDTF's investigation, between June 2 and August 15, 2011, law enforcement conducted four controlled purchases of 30 mg oxycodone pills from Mr. Larrow at the 73 Hyde Road address.

On August 17, 2011, VDTF applied to a state court judge for a warrant to search 73 Hyde Road for evidence regarding the distribution of controlled substances. The warrant application was granted that same day and was executed the following day on August 18, 2011. In the course of their search of 73 Hyde Road, law enforcement found concealed cash in the amount of $11,746 which included $180 of VDTF funds that had been used in the August 15, 2011 controlled purchase of oxycodone from Mr. Larrow. Also found in Mr. Larrow's residence were the following pills: 42 hydrocodone (10mg), 21 hydrocodone (5mg), 14 Oxycontin (30mg), 41 oxycodone (15mg), 143 oxycodone (30mg), and 5 Adderall (10mg). Both Mr. Larrow and his girlfriend, Crystal Miller, who also lives as 73 Hyde Road, were present during the execution of the search warrant.

Sergeant Randall of the Vermont State Police interviewed Ms. Miller at the residence after advising her she was not in custody. Ms. Miller told Sergeant Randall that Mr. Larrow sold pills at 73 Hyde Road and had approximately 100 pill customers. She further stated that Mr. Larrow received a delivery of approximately 300 pills approximately once week from two men. The men who delivered the pills would typically arrive in either a black pickup truck or a green sedan, alternating between these vehicles week to week. Ms. Miller advised that the men travelled from New York to Vermont via ferry and usually called Mr. Larrow while they were on the ferry in order to provide an estimated arrival time. Ms. Miller advised that a pill delivery was expected to

---

[1] The parties agree that the court may consider the videotape as evidence in this case.

arrive that day from New York at approximately 11:00 a.m. She further advised that because the pill couriers had used a black pickup for the previous delivery, she expected them to arrive in a green sedan.

Mr. Larrow was arrested during the execution of the search warrant and, after receiving *Miranda* warnings, agreed to speak to Detective Daley. Mr. Larrow stated that he received a delivery of pills approximately every week or two weeks and the source of his pills was a male named "Jay" from New York. Mr. Larrow would typically speak with Jay on the telephone to arrange a date and time for the delivery of pills. Jay would then send men to Mr. Larrow's 73 Hyde Road residence for the delivery. During the delivery, Mr. Larrow would only deal with one skinny dark skinned male in his twenties who would enter 73 Hyde Road and exchange pills for money. Other men would accompany this male but would wait in the car. They did not interact with Mr. Larrow. According to Mr. Larrow, the same men did not always accompany the pill courier. He acknowledged that the concealed funds in the amount of approximately $11,000 which law enforcement had discovered in the course of the search were to be used to purchase the next shipment of pills.

Mr. Larrow further advised that for the last few pill deliveries, the pill couriers arrived in Vermont via the Lake Champlain ferry that travels from Plattsburgh, New York to Grand Isle, Vermont. He noted that he was expecting the pills to be delivered to 73 Hyde Road between 9:00 a.m. and 11:00 a.m. that day. He initially stated that he expected the delivery to be between 700 and 800 pills, but later said that he expected the delivery to be between 300 and 400 pills.

Thereafter, Detective Daley brought Mr. Larrow to the ferry dock in an undercover law enforcement vehicle to await the pill couriers. At around the same time, other law enforcement officers established surveillance around 73 Hyde Road. At approximately 10:10 a.m., Detective Daley saw a dark skinned male, who appeared to be in his twenties, driving a vehicle with New Jersey plates that had just disembarked from the ferry. Detective Daley asked Mr. Larrow if the operator of the vehicle with the New Jersey plates was the pill courier. Mr. Larrow stated that it was not and that he did not

3

recognize the operator of the vehicle in question. Approximately four minutes later, while sitting with Detective Daley in the law enforcement vehicle, Mr. Larrow received a call from incoming number (347) 624-3266. Detective Daley could only hear Mr. Larrow's side of the telephone call. After the call ended, Mr. Larrow advised that he was speaking with the pill courier who was only a few minutes away from Mr. Larrow's residence.

Approximately ten minutes after the phone call with the pill courier, Sergeant Randall, who was inside 73 Hyde Road, saw a man, later identified as Elkin Tabares, walking toward the entrance of the bait shop. Sergeant Randall and another officer placed Mr. Tabares in handcuffs. The other officer patted down Mr. Tabares outside his clothing and felt what appeared to be a bag of pills in Mr. Tabares's front pocket. The pocket was not searched at that time. Sergeant Randall asked Mr. Tabares where his car was and he looked down the driveway to 73 Hyde Road. From law enforcement's vantage point in front of the residence, portions of the winding driveway were not visible.

At approximately the same time, other law enforcement officers came upon the Defendant sitting in the driver's seat of a green four-door Hyundai with New Jersey plates which was parked in the driveway of 73 Hyde Road. These officers asked the Defendant to exit his vehicle and stand in front of a Vermont State Police cruiser. The cruiser's camera partially depicts what happened next.

Sergeant Randall walked with Crystal Miller past Mr. Tabares and Ms. Miller identified Mr. Tabares as a man who previously delivered pills to Mr. Larrow. Sergeant Randall and Ms. Miller then walked down the driveway towards Defendant. From a distance of approximately thirty feet,[2] Sergeant Randall and Ms. Miller paused. At the time, Defendant was standing with his back facing them and his front facing a police cruiser hood upon which he is leaning with his palms down. A uniformed police officer

---

[2] Because of the distance, the cruiser camera depicts neither the women's features nor even enough detail to confirm their gender. The court's estimate of the distance is based upon car lengths (as there are two aligned end to end in the video) and is further based upon a law enforcement officer's approximate seventeen paces from the police cruiser to the women.

4

stood directly behind Defendant. There were no other civilians in sight. In addition, Defendant was the only person of color and the only person in his twenties in sight.

Law enforcement told Defendant to turn around and face Ms. Miller. He did so for approximately four seconds during which Ms. Miller allegedly identified him. Defendant was then told to turn back towards the police cruiser whereupon he was told to put his hands behind his back and was handcuffed and arrested.

After his arrest and receipt of *Miranda* warnings, Defendant agreed to speak with law enforcement and made incriminating statements.

## II.    Conclusions of Law and Analysis.

The Government bears the burden in the first instance to establish that Defendant's incriminating statements are the fruits of a lawful arrest. Here, Defendant argues that his arrest was not lawful because the "show[up] here was so impermissibly suggestive that it violated [his] right to due process of law." (Doc. 34 at 3.) Defendant further contends that, in light of Mr. Larrow's statements that he did not recognize Defendant, without Ms. Miller's identification, law enforcement lacked probable cause for Defendant's arrest.

The Government counters that on-the-scene identifications are acceptable, lawful, and preferable to unnecessary detention of innocent suspects. The Government further argues that law enforcement had probable cause to arrest Defendant even without Ms. Miller's identification.

### A.    Whether the Showup Was Impermissibly Suggestive.

The United States Supreme Court has recognized that, after examining the totality of the circumstances, an identification procedure may be "so unnecessarily suggestive and conducive to irreparable mistaken identification that [a criminal defendant] [is] denied due process of law." *Stovall v. Denno*, 388 U.S. 293, 302 (1967), *overruled on other grounds by Griffith v. Kentucky*, 479 U.S. 314 (1987). In so ruling, the Court noted that, "[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." *Id.* at 302.

In *Neil v. Biggers*, 409 U.S. 188 (1972), the Court went further and articulated a two pronged test for addressing a motion to suppress based upon an impermissibly

5

suggestive identification. First, the defendant must establish that the identification procedure was impermissibly suggestive. If the first prong is satisfied, then the court must consider as part of the totality of the circumstances: "the opportunity of the witness to view the criminal at the time of the crime, the witness'[s] degree of attention, the accuracy of the witness'[s] prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id.* 199-200; *see also Manson v. Brathwaite*, 432 U.S. 98, 107 (1977) ("[T]he first inquiry [is] whether the police used an impermissibly suggestive [identification] procedure[.] *If so*, the second inquiry is whether, under all the circumstances, that suggestive procedure gave rise to a substantial likelihood of irreparable misidentification.").[3]

Typically, the issue is raised as a challenge to the length and degree of detention in an investigative stop[4] or as a challenge to the admissibility of a pre-trial identification on the grounds that an impermissibly suggestive identification may give rise to a due

---

[3] In determining the due process requirements of their states' constitutions, several state courts have rejected the "*Biggers* factors," finding they fail to reflect scientific literature that documents both the unreliability of eyewitness identification and its persuasiveness to inadequately instructed jurors. *See, e.g., State v. Ramirez*, 817 P.2d 774, 780 (Utah 1991) (vacating conviction and requiring "an in-depth appraisal of the identification's reliability," noting "[w]e do not entirely agree with *Biggers* listing of the relevant criteria for determining the reliability of eyewitness identifications and . . . find some of those criteria to be scientifically unsound." ); *Commonwealth v. Johnson*, 650 N.E.2d 1257, 1264 (Mass. 1995) (declining to employ *Biggers* factors for state constitutional challenge to identification and holding that per se exclusion is required because "[o]nly a rule of per se exclusion can ensure the continued protection against the danger of mistaken identification and wrongful convictions."); *State v. Dubose*, 699 N.W.2d 582, 592 (Wis. 2005) (observing that numerous studies confirm that eyewitness testimony is often "hopelessly unreliable," that "it is extremely difficult, if not impossible, for courts to distinguish between identifications that were reliable and identifications that were unreliable," and rejecting *Biggers* as the proper test) (internal citations omitted); *see also State v. Leclair*, 385 A.2d 831, 833 (N.H. 1978) ("Considering the complexity of the human mind and the subtle effects of suggestive procedures upon it, a determination that an identification was unaffected by such procedures must itself be open to serious question.").

[4] *See, e.g., United States v. McCargo*, 464 F.3d 192, 198 (2d Cir. 2006) (affirming the constitutionality of the practice of "extend[ing] the *Terry* stop briefly to transport [the suspect] to the crime scene to see whether he could be identified by the victim.").

process violation.[5] Less commonly, the issue is addressed in the context of a challenge to probable cause.[6] Here, although framed as a due process violation, Defendant essentially asks the court to exclude Ms. Miller's identification from the determination of probable cause, find Defendant's arrest unlawful for lack of probable cause, and suppress his statements as the fruits of an unlawful arrest.

The court starts with the proposition that showups are not *per se* unlawful. *See Readdon v. Senkowski*, 1998 WL 720682, at *2 (S.D.N.Y. Oct. 13, 1998) (Despite the fact that "all police-arranged show[-]ups are suggestive to a degree," showups are nonetheless permissible "if performed in a way to facilitate a prompt identification."); *Hoyle v. Lape*, 2009 WL 928342, at *11 (E.D.N.Y. Apr. 3, 2009) ("Unnecessary suggestiveness in identification procedures does not, standing alone, amount to a violation of due process."). They are, however, generally reserved for exigent circumstances in which a prompt identification is required. "Exigent circumstances generally weigh in favor of concluding that a showup identification procedure was not unnecessarily suggestive, because a showup procedure may be necessary in such circumstances to quickly confirm the identity of a suspect, or to ensure the release of an innocent suspect." *Brisco v. Ercole*, 565 F.3d 80, 88 (2d Cir. 2009); *but see United States v. Jones*, 652 F. Supp. 1561, 1570 (S.D.N.Y. 1986) ("In the absence of exigent

---

[5] "The suggestive elements in this identification procedure made it all but inevitable that [the witness] would identify petitioner . . . . In effect, the police repeatedly said to the witness, 'This is the man.' . . . This procedure so undermined the reliability of the eyewitness identification as to violate due process." *Foster v. California*, 394 U.S. 440, 443 (1969) (addressing identification procedure in which first line-up contained suspect and two other men, when no identification was made, police permitted witness and defendant a one-to-one encounter. When witness's identification remained tentative, police showed witness a second line-up in which suspect was the only person who appeared in both line-ups whereupon a positive identification was made).

[6] *See, e.g.*, *Green v. City of Paterson*, 971 F. Supp. 891, 904 (D.N.J. 1997) (addressing whether show-up identifications undermined probable cause basis for arrest and applying standard for excluding identification from trial); *Brodnicki v. City of Omaha*, 75 F.3d 1261, 1266 (8th Cir. 1996) (finding that show-up should not be excluded from probable cause analysis because it was not impermissibly suggestive).

circumstances, presentation of a single photograph to the victim of a crime amounts to an unnecessarily suggestive photographic identification procedure.").

Here, the Government contends that arranging a multi-person line-up or photo display would have "risked detaining Tabares and Delvalle longer than necessary and jeopardized law enforcement's opportunity to arrest the couriers when they arrived at Hyde Street." (Doc. 37 at 6.) Given Mr. Larrow's inability to identify Defendant as a pill courier when he disembarked from the ferry, the possibility of releasing Defendant on the basis of his noninvolvement in the crime under investigation was real and immediate. As a result, asking Ms. Miller for a quick identification of Defendant and Mr. Tabares conformed to "now settled law that prompt on-the-scene confrontation is consistent with good police work." *United States ex rel. Cummings v. Zelker*, 455 F.2d 714, 716 (2d Cir. 1972).

*United States v. Bautista*, 23 F.3d 726 (2d Cir. 1994) provides further support for this approach. There, federal agents executed a search warrant for several apartments and arrested nine people based in part on information from a confidential informant ("CI"). After the arrests, "[o]ne at a time, each person was brought to a car in which sat the CI. The CI was asked to view each to determine whether he or she was one of the people involved in the narcotics operation." *Id.* at 729. The *Bautista* court concluded that the showup served a valid purpose as it confirmed the suspects' identity, particularly given the CI's previous opportunities to observe the suspects. *Id.* at 730. Even though "the suspects were handcuffed, in the custody of law enforcement officers, and illuminated by flashlights," the *Bautista* court concluded that these factors of handcuffs, custody, and lights were "necessary incidents of an on-the-scene identification." *Id.* The *Bautista* court found that "the presentation of the suspects to the CI immediately following the raid was not unnecessarily suggestive." *Id.*

Similarly, in *Zelker*, 455 F.2d at 716, the police apprehended fleeing burglary suspects and brought them back to the victim's house, where the victim positively identified the men as the burglars she had seen. The district court rejected the defendant's claim that this identification was impermissibly suggestive under *Stovall*, and

8

the Second Circuit affirmed that conclusion, noting that "this prompt confrontation was desirable because it served to insure 'the immediate release of an innocent suspect and at the same time enable the police to resume the search for the fleeing culprit while the trail is fresh.'" *Id.* (quoting *Bates v. United States*, 405 F.2d 1104, 1106 (1968)).

Having determined that there were exigent circumstances and that the showup was necessary and consistent with good police work, the court turns to whether the showup should nonetheless be excluded from a determination of probable cause. Here, the one person showup was clearly unnecessarily suggestive.[7] At the time of the showup, Defendant was the only person of color, the only person in his twenties, and the only civilian surrounded by law enforcement officers. When Ms. Miller approached for the express purpose of identifying a pill courier, Defendant was facing the front of a police cruiser in the "arrest" position with a uniformed officer directly behind him. He turned around at the direction of law enforcement for approximately four seconds so that Ms. Miller could identify him at a distance. Ms. Miller, a suspect in the crime herself, had an interest in cooperating, and identified Defendant in approximately the same amount of

---

[7] One court's observations highlight some of the deficiencies of the showup in question:

> [I]t is important that showups are not conducted in locations, or in a manner, that implicitly conveys to the witness that the suspect is guilty. Showups conducted in police station, squad cars, or with the suspect in handcuffs that are visible to any witness, all carry with them inferences of guilt, and thus should be considered suggestive. Next, officers investigating the matter at issue should proceed with caution in instruction of the witness. The investigators must realize a witness's memory of an event can be fragile and that the amount and accuracy of the information obtained from a witness depends in part on the method of questioning. Therefore, an eyewitness should be told the real suspect may or may not be present, and the investigation will continue regardless of the result of the impending identification procedure. Finally, it is important that a suspect be shown the witness only once. If a suspect is identified, the police have no reason to conduct further identification procedures. Conversely, if the suspect is not identified by the witness, he or she should not be presented to that witness in any subsequent showups. While this list is far from complete, a showup conducted in accord with these standards will do much to alleviate the inherent suggestiveness of the procedure.

*State v. Nawrocki*, 746 N.W.2d 509, 517 (Wis. Ct. App. 2008).

time as it took Defendant to turn around. The identification procedure used was thus highly suggestive and there was no apparent effort by law enforcement to render it less so.

To determine whether Ms. Miller's identification was nonetheless reliable, the court turns to the totality of the circumstances and the *Biggers* factors. The Government proffered no information regarding Ms. Miller's prior contact with the Defendant and her opportunity to identify him at the time of the crime, the degree of her attention, the accuracy of her prior descriptions of the Defendant, the certainty of her identification at the scene,[8] and the length of time between Defendant's last alleged pill delivery and the day in question.[9] Thus, none of the *Biggers* factors support a finding that Ms. Miller's identification was reliable notwithstanding the highly suggestive circumstances in which it took place. Against this backdrop, the court has little hesitation in finding that the totality of the circumstances support a conclusion that the showup was so impermissibly suggestive as to be conducive to an irreparable mistaken identification. *Stovall*, 388 U.S. at 301-02. As such, it should be excluded from the court's probable cause determination. *See Green*, 971 F. Supp. at 904. The court thus turns to whether, in the absence of Ms. Miller's identification, law enforcement had probable cause to arrest the Defendant.

## B.    Probable Cause to Arrest Without Ms. Miller's Identification.

The Fourth Amendment prohibits a police officer from arresting a citizen except upon probable cause. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 168-69 (1972).

> Probable cause to arrest a person exists if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution

---

[8] At the suppression hearing held in Mr. Tabares's case, Ms. Miller had considerable difficulty in recalling whether, on the day in question, she identified both Defendant and Mr. Tabares or only one of them. Her testimony varied based upon whether the prosecution or the defense asked her the question and, in the court's opinion, remained inconclusive.

[9] The court cannot reasonably infer that Ms. Miller saw Defendant approximately one week prior to the showup in light of evidence that the men who travelled with the pill courier changed from time to time and Ms. Miller provided no information that she saw or interacted with those individuals.

in believing that an offense has been or is being committed by the person to be arrested.

*United States v. Patrick*, 899 F.2d 169, 171 (2d Cir. 1990). "To determine whether an officer had probable cause to arrest an individual, [the court] examine[s] the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (internal quotation and citation omitted). A police officer is not required to "conduct a mini-trial" prior to an arrest. *Brodnicki v. City of Omaha*, 75 F.3d 1261, 1264 (8th Cir. 1996). For this reason, "the probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. Because the standard is fluid and contextual, a court must examine the totality of the circumstances[.]" *United States v. Delossantos,* 536 F.3d 155, 159 (2d Cir. 2008) (citations and internal quotation marks omitted).

Here, Defendant contends that law enforcement lacked probable cause without Ms. Miller's identification in part because Mr. Larrow stated that he did not recognize Defendant. He argues that law enforcement must consider all evidence in determining probable cause and "may not disregard plainly exculpatory evidence." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006). However, there is no evidence that the law enforcement disregarded Mr. Larrow's statements instead of considering them as part of the totality of the circumstances. Moreover, Mr. Larrow's statements were not "plainly exculpatory." Defendant did in fact match Mr. Larrow's description of the pill courier and although Mr. Larrow stated that he dealt directly with a skinny, dark skinned man in his twenties, he also told law enforcement that other men who travelled with this individual, remained in the vehicle, and were not always the same men each time. As a result, Mr. Larrow's inability to identify the driver of the green Hyundai as a pill courier was not dispositive of the question of whether Defendant was travelling with the pill courier to make a delivery to Mr. Larrow.

Considering Mr. Larrow's statements as part of the totality of the circumstances, there remained ample evidence to support a reasonable belief that Defendant was a participant in the delivery of pills to 73 Hyde Road. At the time of Defendant's arrest, law enforcement knew that the pill couriers had travelled from New York to Vermont via ferry to make a delivery and that the couriers usually called Mr. Larrow shortly before their arrival. Law enforcement also knew that the couriers typically alternated between a black pickup truck and a green sedan and that it was likely that the vehicle would be a green sedan on the day in question. They knew that Mr. Larrow had received a call from the pill courier, and the pill courier had advised him that he would be arriving at Mr. Larrow's residence shortly. Mr. Tabares and Defendant arrived at 73 Hyde Road approximately ten minutes after the call to Mr. Larrow, during the time frame previously predicted by both Ms. Miller and Mr. Larrow for the pill delivery. Their vehicle matched Ms. Miller's description. When a law enforcement officer patted down Mr. Tabares's clothing, he felt what appeared to be a bag of pills in Mr. Tabares's front pocket. Ms. Miller had identified Mr. Tabares as one of the pill couriers. All of this occurred prior to the showup identification of Defendant. Accordingly, even in the absence of Ms. Miller's identification, law enforcement had a reasonable belief based upon objective facts that Defendant was a participant in the anticipated delivery of pills to Mr. Larrow at 73 Hyde Road.

Because Defendant's warrantless arrest was supported by probable cause and was therefore lawful, the fruits of that arrest, including Defendant's statements, are admissible. *See New York v. Harris*, 495 U.S. 14, 10-21 (1990).

## CONCLUSION

For the foregoing reasons, the court DENIES Defendant's motion to suppress (Doc. 34). In so ruling, the court points out that, in addition to excluding Ms. Miller's identification of Defendant as part of the court's probable cause analysis, her identification of the Defendant may also be subject to exclusion as evidence at trial. *See Braithwaite*, 432 U.S. at 114 (an impermissibly suggestive and unreliable pretrial identification will violate a defendant's right to due process if introduced at trial).

However, the court will await a motion in limine before deciding that issue as it is not squarely raised by the parties' filings. *See Simmons v. United States*, 390 U.S. 377, 384 (1968) (Before excluding identification evidence, the court must be persuaded that there was "a very substantial likelihood of irreparable misidentification.") (citation omitted). SO ORDERED.

Dated at Rutland, in the District of Vermont, this 8th day of February, 2012.

Christina Reiss, Chief Judge
United States District Court