U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED
2012 MAR 12 PM 4:08
CLERK
BY
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 5:11-cr-90-02 |
| ) | |
| ELKIN TABARES ) | |

**OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**
(Doc. 33)

This matter came before the court for an evidentiary hearing on December 19, 2011 on Defendant Elkin Tabares's Motion to Suppress (Doc. 33). Defendant contends that evidence found on his person and statements made after arrest should be suppressed as fruits of an unlawful arrest. The Government opposes the motion. The parties completed supplemental briefing on January 12, 2012.

The Government is represented by AUSA Attorney Timothy C. Doherty, Jr. Defendant is represented by David J. Williams, Esq.

**I.  Factual Background.**

Defendant is charged with violating 21 U.S.C. §§ 841(a), (b)(1)(C) and 846, for knowingly and willfully conspiring to distribute oxycodone, a Schedule II controlled substance.

In opposing Defendant's motion to suppress, and to establish probable cause, the Government relies upon the Affidavit of Vermont State Trooper Detective Matthew Daley (the "Daley Affidavit"). According to the Daley Affidavit, in approximately June of 2011, the Vermont Drug Task Force ("VDTF") began investigating co-defendant Michael Larrow for the distribution of oxycodone. Mr. Larrow lives at 73 Hyde Road in Grand Isle, Vermont. He operates a bait shop from that same address. As part of VDTF's investigation, between June 2 and August 15, 2011, law enforcement conducted

four controlled purchases of 30 mg oxycodone pills from Mr. Larrow at the 73 Hyde Road address.

On August 17, 2011, VDTF applied to a state court judge for a warrant to search 73 Hyde Road for evidence regarding the distribution of controlled substances. The warrant application was granted that same day and was executed the following day on August 18, 2011. In the course of their search of 73 Hyde Road, law enforcement found concealed cash in the amount of $11,746 which included $180 of VDTF funds that had been used in the August 15, 2011 controlled purchase of oxycodone from Mr. Larrow. Also found in Mr. Larrow's residence were the following pills: 42 hydrocodone (10mg), 21 hydrocodone (5mg), 14 Oxycontin (30mg), 41 oxycodone (15mg), 143 oxycodone (30mg), and 5 Adderall (10mg). Both Mr. Larrow and his girlfriend, Crystal Miller, who also lives as 73 Hyde Road, were present during the execution of the search warrant.

Sergeant Theresa Randall of the Vermont State Police interviewed Ms. Miller at the residence after advising her she was not in custody. Ms. Miller told Sergeant Randall that Mr. Larrow sold pills at 73 Hyde Road and had approximately 100 pill customers. She further stated that Mr. Larrow received a delivery of approximately 300 pills approximately once a week from two men. The men who delivered the pills typically arrived in either a black pickup truck or a green sedan, alternating between these vehicles from week to week. Ms. Miller advised that the men travelled from New York to Vermont via ferry and usually called Mr. Larrow while they were on the ferry in order to provide an estimated arrival time. Ms. Miller advised that a pill delivery was expected to arrive that day from New York at approximately 11:00 a.m. She further advised that because the pill couriers had used a black pickup for the previous delivery, she expected them to arrive in a green sedan.

Mr. Larrow was arrested during the execution of the search warrant and, after receiving *Miranda* warnings, agreed to speak to Detective Daley. Mr. Larrow stated that he received a delivery of pills approximately every week or two from a male named "Jay" from New York. Mr. Larrow would typically speak with Jay on the telephone to arrange a date and time for the delivery of pills. Jay would then send men to Mr.

Larrow's 73 Hyde Road residence for the delivery. During the delivery, Mr. Larrow would only deal with a skinny dark skinned male in his twenties who would enter 73 Hyde Road and exchange pills for money. Other men would accompany this male but would wait in the car. According to Mr. Larrow, the same men did not always accompany the pill courier. He acknowledged that the concealed funds in the amount of approximately $11,000 which law enforcement discovered in the course of the search were to be used to purchase his next shipment of pills.

Mr. Larrow further advised that for the last few pill deliveries, the pill couriers arrived in Vermont via the Lake Champlain ferry that travels from Plattsburgh, New York to Grand Isle, Vermont. He noted that he was expecting the pills to be delivered to 73 Hyde Road between 9:00 a.m. and 11:00 a.m. that day. He initially stated that he expected the delivery to be between 700 and 800 pills, but later said that he expected the delivery to be between 300 and 400 pills.

Thereafter, Detective Daley brought Mr. Larrow to the ferry dock in an undercover law enforcement vehicle to await the pill couriers. At around the same time, other law enforcement officers established surveillance around 73 Hyde Road. At approximately 10:10 a.m., Detective Daley saw a dark skinned male, who appeared to be in his twenties, driving a vehicle with New Jersey plates that had just disembarked from the ferry. Detective Daley asked Mr. Larrow if the operator of the vehicle with the New Jersey plates was the pill courier. Mr. Larrow stated that it was not and that he did not recognize the operator of the vehicle in question. Approximately four minutes later, while sitting with Detective Daley in the law enforcement vehicle, Mr. Larrow received a call from incoming number (347) 624-3266.[1] Detective Daley could only hear Mr. Larrow's side of the telephone call. After the call ended, Mr. Larrow advised that he was speaking with the pill courier who was only a few minutes away from Mr. Larrow's residence.

Approximately ten minutes after the phone call with the pill courier, Sergeant Randall, who was inside 73 Hyde Road, saw a man, later identified as the Defendant

---

[1] The telephone number indicates a New York area code.

3

walking toward the entrance of the bait shop. Upon the arrival of the Defendant, Sergeant Randall walked outside. She instructed Deputy Sheriff Scott Rogers of the Grand Isle County Sheriff's Department to detain the Defendant. Deputy Rogers, who was outside by that time, ordered Defendant to stop, identify himself, and "show me your hands." Defendant took a couple of steps backwards and started to turn around. Deputy Rogers put a hand on Defendant to stop him and then handcuffed him. Deputy Rogers patted down the outside of Defendant's clothing. Deputy Rogers testified that he felt a bulge in Defendant's front left pocket, between the size of a golf ball and a baseball, which felt like a bean bag. Although the bulge felt like pills, Deputy Rogers did not take them out at that time. Sergeant Randall corroborated this account, testifying that she did not observe Deputy Rogers search inside Defendant's clothing at that time. When Deputy Rogers asked Defendant what was in his pocket, Defendant responded, "That's mine." Defendant asked what was going on, and Deputy Rogers replied that Defendant was being detained and that someone would explain it to him.

At some point,[2] Sergeant Randall asked the Defendant where his car was and he looked down the driveway. From law enforcement's vantage point in front of the bait shop, portions of the winding driveway were not visible.

At approximately the same time, other law enforcement officers encountered co-defendant Jonathan Delvalle sitting in the driver's seat of a green four-door Hyundai with New Jersey plates which was parked in the driveway of 73 Hyde Road. These officers asked the Defendant to exit his vehicle and stand in front of a Vermont State Police cruiser. The cruiser's camera partially depicts what happened next.

Sergeant Randall brought Crystal Miller outside and asked her to identify the Defendant. Ms. Miller immediately stated, "Yes, that's him. That's him." This identification took place in Deputy Roger's presence. Sergeant Randall and Ms. Miller then went back inside the residence. Sergeant Randall told Ms. Miller that a second person needed to be identified. While inside 73 Hyde Road, Ms. Miller was visibly

---

[2] Sergeant Randall was uncertain whether this conversation took place before or after Ms. Miller's identification of the Defendant.

4

nervous, and she told Sergeant Randall that she was concerned about walking past Defendant after he knew that she had identified him. Sergeant Randall asked Ms. Miller if she would feel more comfortable going past him again if Ms. Miller were to say "No, that's not him" when walking by. Sergeant Randall testified that this was intended to be a ruse. Ms. Miller agreed to this proposal.

Ms. Miller and Sergeant Randall then walked outside again. As she walked past Defendant the second time, Ms. Miller stated that she did not recognize him. Deputy Rogers was standing next to Defendant and saw Sergeant Randall wink and nod as she walked past which Deputy Rogers understood to mean that Ms. Miller's statement was a ruse. Sergeant Randall and Ms. Miller then walked down the driveway towards where Mr. Delvalle was standing. From a distance of approximately thirty feet,[3] Sergeant Randall and Ms. Miller paused. At the time, Mr. Delvalle was standing with his back facing them and his front facing a police cruiser hood upon which he is leaning with his palms down. A uniformed police officer stood directly behind Mr. Delvalle. There were no other civilians in sight and Mr. Delvalle was the only person of color and the only person in his twenties.

Law enforcement told Mr. Delvalle to turn around and face Ms. Miller. He did so for approximately four seconds during which Ms. Miller allegedly identified him. Defendant was then told to turn back towards the police cruiser whereupon he was told to put his hands behind his back and was handcuffed and arrested.

After Ms. Miller provided an identification of Mr. Delvalle, she and Sergeant Randall returned to the residence. Defendant was then placed under arrest. Deputy Rogers searched the inside of Defendant's pockets and found a sock containing approximately 408 pills that were later determined to be oxycodone.

At the evidentiary hearing, Ms. Miller provided conflicting testimony regarding whether she had been able to identify one or two men on August 18, 2011. She

---

[3] Because of the distance, the cruiser camera depicts neither the women's features nor even enough detail to confirm their gender. The court's estimate of the distance is based upon car lengths (as there are two aligned end to end in the video) and is further based upon a law enforcement officer's approximate seventeen paces from the police cruiser to the women.

5

responded to questions from the Government that she was able to identify two men including the Defendant. She responded to questions from defense counsel that she was only able to identify one man, Jonathan Delvalle, and admitted that she had previously told defense counsel's investigator that she was only able to identify one man. The court finds Ms. Miller's testimony on this issue inconclusive and unreliable.

## II. Conclusions of Law and Analysis.

### A. Search of Defendant's Front Pocket.

Defendant's original motion sought suppression of the pills found in his front pocket, as well as the statements he made after his arrest, asserting that the search of the contents of the sock took place during law enforcement's initial pat down of his clothing. At the court's evidentiary hearing, the Defendant did not testify. Two witnesses for the Government, however, credibly testified that the initial pat down disclosed only what appeared to be a bag of pills and it was not until after Defendant's arrest that an actual search of the sock's contents took place. A search for contraband incident to arrest is lawful under the Fourth Amendment. *See Arizona v. Gant*, 556 U.S. 332, 338 (2009) ("Among the exceptions to the warrant requirement is a search incident to a lawful arrest."). The court thus finds that the search of Defendant's front pocket presents no constitutional violations provided the Defendant's arrest was lawful.

### B. Whether There Was Probable Cause For Defendant's Arrest.

Defendant presently moves for suppression on the grounds that Ms. Miller's identification of both him and his co-defendant, Jonathan Delvalle, was impermissibly suggestive and that, without those identifications, law enforcement lacked probable cause for his arrest. He points out that at the court's evidentiary hearing, Ms. Miller's testimony was inconsistent on the issue of whether she could identify both Defendant and Mr. Delvalle or only one of them.

The Government bears the burden to establish that Defendant's incriminating statements and other evidence obtained from him are the fruits of a lawful arrest. It argues that on-the-scene identifications are acceptable, lawful, and preferable to unnecessary detention of innocent suspects. The Government further argues that law

6

enforcement had probable cause to arrest Defendant even without Ms. Miller's identifications.

### 1. Whether the Identifications were Impermissibly Suggestive.

This court has already ruled that Crystal Miller's identification of Jonathan Delvalle was impermissibly suggestive and should be excluded from a probable cause analysis. *See United States v. Delvalle*, (Doc. 58). The court accordingly turns to whether her identification of the Defendant should also be excluded. In doing so, it adopts the same analytical framework set forth in *Delvalle*.

The United States Supreme Court has recognized that, after examining the totality of the circumstances, an identification procedure may be "so unnecessarily suggestive and conducive to irreparable mistaken identification that [a criminal defendant] [is] denied due process of law." *Stovall v. Denno*, 388 U.S. 293, 302 (1967), *overruled on other grounds by Griffith v. Kentucky*, 479 U.S. 314 (1987). In so ruling, the Court noted that, "[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." *Id.* at 302.

In *Neil v. Biggers*, 409 U.S. 188 (1972), the Court went further and articulated a two pronged test for addressing a motion to suppress based upon an impermissibly suggestive identification. First, the defendant must establish that the identification procedure was impermissibly suggestive. If the first prong is satisfied, then the court must consider as part of the totality of the circumstances: "the opportunity of the witness to view the criminal at the time of the crime, the witness'[s] degree of attention, the accuracy of the witness'[s] prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id.* 199-200; *see also Manson v. Brathwaite*, 432 U.S. 98, 107 (1977) ("[T]he first inquiry [is] whether the police used an impermissibly suggestive [identification] procedure[.] *If so*, the second inquiry is whether, under all the

circumstances, that suggestive procedure gave rise to a substantial likelihood of irreparable misidentification.").[4]

Typically, the issue is raised as a challenge to the length and degree of detention in an investigative stop[5] or as a challenge to the admissibility of a pre-trial identification on the grounds that an impermissibly suggestive identification may give rise to a due process violation.[6] Less commonly, the issue is addressed in the context of a challenge to probable cause.[7] Here, Defendant asks the court to exclude Ms. Miller's

---

[4] In determining the due process requirements of their states' constitutions, several state courts have rejected the "*Biggers* factors," finding they fail to reflect scientific literature that documents both the unreliability of eyewitness identification and its persuasiveness to inadequately instructed jurors. *See, e.g., State v. Ramirez*, 817 P.2d 774, 780 (Utah 1991) (vacating conviction and requiring "an in-depth appraisal of the identification's reliability," noting "[w]e do not entirely agree with *Biggers* listing of the relevant criteria for determining the reliability of eyewitness identifications and . . . find some of those criteria to be scientifically unsound." ); *Commonwealth v. Johnson*, 650 N.E.2d 1257, 1264 (Mass. 1995) (declining to employ *Biggers* factors for state constitutional challenge to identification and holding that per se exclusion is required because "[o]nly a rule of per se exclusion can ensure the continued protection against the danger of mistaken identification and wrongful convictions."); *State v. Dubose*, 699 N.W.2d 582, 592 (Wis. 2005) (observing that numerous studies confirm that eyewitness testimony is often "hopelessly unreliable," that "it is extremely difficult, if not impossible, for courts to distinguish between identifications that were reliable and identifications that were unreliable," and rejecting *Biggers* as the proper test) (internal citations omitted); *see also State v. Leclair*, 385 A.2d 831, 833 (N.H. 1978) ("Considering the complexity of the human mind and the subtle effects of suggestive procedures upon it, a determination that an identification was unaffected by such procedures must itself be open to serious question.").

[5] *See, e.g., United States v. McCargo*, 464 F.3d 192, 198 (2d Cir. 2006) (affirming the constitutionality of the practice of "extend[ing] the *Terry* stop briefly to transport [the suspect] to the crime scene to see whether he could be identified by the victim.").

[6] "The suggestive elements in this identification procedure made it all but inevitable that [the witness] would identify petitioner . . . . In effect, the police repeatedly said to the witness, 'This is the man.' . . . This procedure so undermined the reliability of the eyewitness identification as to violate due process." *Foster v. California*, 394 U.S. 440, 443 (1969) (addressing identification procedure in which first line-up contained suspect and two other men, when no identification was made, police permitted witness and defendant a one-to-one encounter. When witness's identification remained tentative, police showed witness a second line-up in which suspect was the only person who appeared in both line-ups whereupon a positive identification was made).

[7] *See, e.g., Green v. City of Paterson*, 971 F. Supp. 891, 904 (D.N.J. 1997) (addressing whether show-up identifications undermined probable cause basis for arrest and applying standard for

8

identifications from the determination of probable cause, find his arrest unlawful for lack of probable cause, and suppress his statements and the pills as the fruits of an unlawful arrest.

The court starts with the proposition that showups are not *per se* unlawful. *See Readdon v. Senkowski*, 1998 WL 720682, at *2 (S.D.N.Y. Oct. 13, 1998) (Despite the fact that "all police-arranged show[-]ups are suggestive to a degree," showups are nonetheless permissible "if performed in a way to facilitate a prompt identification."); *Hoyle v. Lape*, 2009 WL 928342, at *11 (E.D.N.Y. Apr. 3, 2009) ("Unnecessary suggestiveness in identification procedures does not, standing alone, amount to a violation of due process."). They are, however, generally reserved for exigent circumstances in which a prompt identification is required. "Exigent circumstances generally weigh in favor of concluding that a showup identification procedure was not unnecessarily suggestive, because a showup procedure may be necessary in such circumstances to quickly confirm the identity of a suspect, or to ensure the release of an innocent suspect." *Brisco v. Ercole*, 565 F.3d 80, 88 (2d Cir. 2009); *but see United States v. Jones*, 652 F. Supp. 1561, 1570 (S.D.N.Y. 1986) ("In the absence of exigent circumstances, presentation of a single photograph to the victim of a crime amounts to an unnecessarily suggestive photographic identification procedure.").

The Government argues that exigent circumstances existed in this case as arranging a multi-person line-up or photo display would have risk detaining Defendant longer than necessary and jeopardized law enforcement's opportunity to arrest the couriers when they arrived at Hyde Street. *See United States ex rel. Cummings v. Zelker*, 455 F.2d 714, 716 (2d Cir. 1972) (ruling that it is "now settled law that prompt on-the-scene confrontation is consistent with good police work."); *see also United States v. Bautista*, 23 F.3d 726, 730 (2d Cir. 1994) (ruling that although "the suspects were handcuffed, in the custody of law enforcement officers, and illuminated by flashlights,"

---

excluding identification from trial); *Brodnicki v. City of Omaha*, 75 F.3d 1261, 1266 (8th Cir. 1996) (finding that show-up should not be excluded from probable cause analysis because it was not impermissibly suggestive).

these circumstances were "necessary incidents of an on-the-scene identification" and "the presentation of the suspects to the CI immediately following the raid was not unnecessarily suggestive." ). The court agrees. This case involves law enforcement officers who were confronted with the presence of the Defendant at the bait shop immediately after the execution of a search warrant revealing evidence of a pill distribution business from that location and immediately after receiving information that the pill courier would be arriving at the location in a matter of minutes. It was thus imperative to determine whether the Defendant was a pill courier or whether he had wandered inadvertently and innocently into the midst of an ongoing police investigation. From a relatively close distance, Ms. Miller identified Defendant as a pill courier in the presence of two law enforcement officers who both testified to that identification.[8] Her subsequent "recantation" of the identification was part of a ruse concocted to address her concerns for her own safety. The circumstances of the identification were undoubtedly suggestive but were consistent with the exigent circumstances presented. The court concludes that the identification was not *impermissibly* suggestive as there was virtually nothing law enforcement could have done to mitigate the suggestiveness and yet ensure a prompt identification.

Having found Ms. Miller's identification of the Defendant was not impermissibly suggestive, at this juncture, the court generally need not further assess its reliability under the *Biggers* factors. *See Brathwaite*, 432 U.S. at 107. However, this case presents an unusual set of circumstances because at the court's evidentiary hearing, Ms. Miller was unable to testify consistently regarding whether she was able to identify one or two men on the day in question. On balance, the evidentiary record before the court supports a conclusion that Ms. Miller identified both men as pill couriers on the date in question but that Mr. Delvalle's identification occurred in impermissibly suggestive circumstances and, as of the court's evidentiary hearing, both identifications remained in question. Compounding this uncertainty is the fact that there is no evidence before the court

---

[8] In light of this finding, the court need not consider the supplemental evidence offered post-hearing by the Government.

10

regarding Ms. Miller's prior contact with the Defendant, the degree of her attention, the accuracy of her prior descriptions of the Defendant, and the length of time between Defendant's last alleged pill delivery and the day in question.[9] The court thus turns to whether probable cause existed even in the absence of Ms. Miller's identifications. If so, there is no need to determine whether Ms. Miller's identification of the Defendant was sufficiently reliable to be considered part of a probable cause analysis.

### 2. Probable Cause to Arrest Without Ms. Miller's Identification.

The Fourth Amendment prohibits a police officer from arresting a citizen except upon probable cause. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 168-69 (1972).

> Probable cause to arrest a person exists if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested.

*United States v. Patrick*, 899 F.2d 169, 171 (2d Cir. 1990). "To determine whether an officer had probable cause to arrest an individual, [the court] examine[s] the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (internal quotation and citation omitted). A police officer is not required to "conduct a mini-trial" prior to an arrest. *Brodnicki v. City of Omaha*, 75 F.3d 1261, 1264 (8th Cir. 1996). For this reason, "the probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. Because the standard is fluid and contextual, a court must examine the totality of the circumstances[.]" *United States v. Delossantos*, 536 F.3d 155, 159 (2d Cir. 2008) (citations and internal quotation marks omitted).

---

[9] The court cannot reasonably infer that Ms. Miller saw Defendant approximately one week prior to the showup in light of evidence that the men who travelled with the pill courier changed from time to time and Ms. Miller provided no information that she saw or interacted with those individuals.

11

In this case, even in the absence of either of Ms. Miller's identifications, there remained ample evidence to support a reasonable belief that Defendant was a participant in the delivery of pills to 73 Hyde Road. At the time of Defendant's arrest, law enforcement knew that the pill couriers had travelled from New York to Vermont via ferry to make a delivery and that the couriers usually called Mr. Larrow shortly before their arrival. They knew that Mr. Larrow had received a call from the pill courier, and the pill courier had advised him that he would be arriving at Mr. Larrow's residence shortly. Defendant arrived at 73 Hyde Road approximately ten minutes after the call to Mr. Larrow, during the time frame previously predicted by both Ms. Miller and Mr. Larrow for the pill delivery.

When law enforcement approached Defendant, he stepped backwards and turned until Deputy Rogers detained him. Defendant looked down the driveway when asked about his car. In a pat down of Defendant's clothing, Deputy Rogers felt what appeared to be a bag of pills in Defendant's front pocket. Accordingly, even in the absence of Ms. Miller's identifications, law enforcement had a reasonable belief based upon objective facts that Defendant was a participant in the anticipated delivery of pills to Mr. Larrow at 73 Hyde Road and, indeed, had the pills in question on his person.

Because Defendant's warrantless arrest was supported by probable cause, the fruits of that arrest, including Defendant's statements and the sock and its contents, are admissible as evidence against him. *See New York v. Harris*, 495 U.S. 14, 10-21 (1990).

## CONCLUSION

For the foregoing reasons, the court DENIES Defendant's motion to suppress (Doc. 33)

SO ORDERED.

Dated at Rutland, in the District of Vermont, this 12th day of March, 2012.

Christina Reiss, Chief Judge
United States District Court